JS 44   (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS
SETH SHUBERT and TERRENCE FRITH

**(b)**  County of Residence of First Listed Plaintiff    Calhoun
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Saura J. Sahu, CLANCY ADVISORS PLC, 230 Nickels Arcade, South State Street, Ann Arbor, MI 48104 - (734)780-7595 - sahu@clancyadvisors.com

## DEFENDANTS
MOR-DALL ENTERPRISES, INC. d/b/a DARK HORSE BREWING CO., a Michigan Corp.; AARON MORSE, KRISTINE MORSE, and CALLY MORSE, each individuals; DARK HORSE HEALTH PLAN

County of Residence of First Listed Defendant    Calhoun
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
　　　Plaintiff

☐ 2   U.S. Government
　　　Defendant

☒ 3   Federal Question
　　　*(U.S. Government Not a Party)*

☐ 4   Diversity
　　　*(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
　　Proceeding

☐ 2  Removed from
　　State Court

☐ 3  Remanded from
　　Appellate Court

☐ 4  Reinstated or
　　Reopened

☐ 5  Transferred from
　　Another District
　　*(specify)*

☐ 6  Multidistrict
　　Litigation -
　　Transfer

☐ 8  Multidistrict
　　Litigation -
　　Direct File

## VI.  CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 1132
Brief description of cause:
Denial of Medical Benefits and ERISA Breach of Fiduciary Duties

## VII.  REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII.  RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
02/19/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/SAURA J. SAHU, 230 Nickels Arcade, Ann Arbor, MI 48104; sahu@clancyadvisors

**FOR OFFICE USE ONLY**

RECEIPT #　　　　　AMOUNT　　　　　APPLYING IFP　　　　　JUDGE　　　　　MAG. JUDGE

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SETH SHUBERT, an individual; and
TERRENCE FRITH, an individual,

Plaintiffs,                                             Hon.

vs.                                                     Case No.

MOR-DALL ENTERPRISES, INC.
d/b/a DARK HORSE BREWING
CO., a Michigan Corporation;                            COMPLAINT
AARON MORSE, an individual;
KRISTINE MORSE, an individual;
CALLY MORSE, an individual;
DARK HORSE HEALTH PLAN, an
ERISA welfare benefit plan,

Defendants.

---

CLANCY ADVISORS PLC                  KRINO LLP
 Saura J. Sahu (Mich. Bar P69627)    Edward D. Gehres, III
*Attorneys for Plaintiffs*           Blake Trueblood
230 Nickels Arcade                   *Of Counsel for Plaintiffs*
328 S. State Street                  1050 30th St, NW
Ann Arbor, MI 48104                  Washington, DC 20007
(734) 780-7595                       Edg@krinowlaw.com
sahu@clancyadvisors.com              Bmt@krinolaw.com

---

## COMPLAINT

---

NOW COME the Plaintiffs Seth Shubert and Terrence "TJ" Frith bring claims against Defendants Mor-Dall Enterprises, Inc. d/b/a Dark Horse Brewing Company ("Dark Horse" or "Company"), Aaron Morse, Kristine Morse, and Cally Morse; as well as the health insurance plan sponsored by Dark Horse (the "Health Plan"); any trust established by Dark Horse to fund benefits pursuant to the Health Plan (the "Health Trust"); the unknown persons to whom Dark Horse delegated fiduciary functions as administrators, custodians, investment managers, or any other fiduciary function of the Health Plan (the "Co-Fiduciaries"), all of whom this Complaint refers to collectively as the "Defendants."

Plaintiffs seek restoration of benefits, injunction or voiding of fraudulent efforts to avoid liability through an asset-sale or other strategic transaction between Dark Horse and Roak Brewing Co., other "make whole relief" for fiduciary violations, and other equitable relief for violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") arising out Defendants' mismanagement of the employees' monies, accounts, contributions and benefits.

## **INTRODUCTION**

1.      In this complaint, Plaintiffs allege that they were deliberately denied ERISA benefits under Dark Horse's Health Plan.

2.      Dark Horse's ERISA violations here stem from its failure to meet its fiduciary duties under the statute. ERISA § 404, 29 U.S.C. § 1104, requires persons

(including Dark Horse as the Plaintiffs' employer) who sponsor employee benefits plans to operate those plans for the exclusive benefit of the plans' participants and beneficiaries. Fundamentally, this means timely remitting any employee wage deductions to maintain plan benefits and refraining from illegally misdirecting those monies. ERISA § 510, 29 U.S.C. § 1140, also prohibits fiduciaries from retaliating against or otherwise interfering with participants' or beneficiaries' ERISA-protected benefits.

3.      At all relevant times, Dark Horse was the Plaintiffs' employer. Dark Horse violated ERISA by misdirecting, misappropriating and absconding with the Plaintiffs' voluntary wage deductions, which were intended to pay for their ERISA-protected health insurance.

4.      In addition, Defendants Aaron Morse, Kristine Morse, and Cally Morse acted individually as fiduciaries and violated their ERISA fiduciary duties arising under ERISA § 404(a), 29 U.S.C. § 1104(a), by embezzling, commingling, and wasting employee contributions; failing to procure or maintain the promised benefit coverage; otherwise failing to apportion and/or forward to fund custodians or plan providers to appropriate monies; and/or conspiring with the other fiduciaries to commit this and other misconduct. Defendants Aaron Morse, Kristine Morse, and Cally Morse, acting individually as fiduciaries of the Health Plan, also failed to monitor other material actions by the Dark Horse employees to whom Dark Horse

3

delegated fiduciary duties and powers.

5.      Through this misconduct, Defendants all caused Plaintiffs harm – including saddling them with hundreds of thousands of dollars in medical bills – for which Plaintiffs seek appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), enforced exclusively in federal court.

6.      By this wrongful conduct, Defendants fraudulently induced Plaintiffs to voluntarily reduce their wages to pay for health insurance premiums.

7.      Accordingly, Defendants must pay the substantial medical bills incurred in reliance on Defendants' consistent and entirely misleading statements about the availability of health insurance coverage. Plaintiffs seek further monetary relief in the form of additional principal, interest, fees and costs that may be charged by any health care provider whose bills the Plaintiffs have paid, as well as the attorney's fees incurred in relation to this dispute. To the extent appropriate and/or consistent with the relief above, Plaintiffs seek to set aside such fraudulently induced and unconscionable wage reductions through the equitable remedy of rescission. Plaintiffs further seek any other such damages, interest, and/or equitable relief as this Court deems just and proper.

## **PARTIES, JURISDICTION AND VENUE**

8.      Plaintiff Seth Shubert is a resident of Marshall, Michigan.

9.      Plaintiff Terrence "TJ" Frith is a resident of Kalamazoo, Michigan.

10.     Defendant Dark Horse is a Michigan corporation headquartered in Marshall, Michigan.

11.     The Health Plan is an "employee welfare benefit plan" within the meaning of ERISA §  3(1), 29 U.S.C. § 1002(1) and the regulations thereunder.

12.     Defendant Aaron Morse resides in Marshall, Michigan. At all times relevant, he and Dark Horse have held him out as the Company's "Owner" and "Head Brewer." He is a fiduciary and/or a de facto fiduciary within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because at all times relevant, he has exerted management and control over the assets of the applicable employee benefit plans. He also exerted control over the appointment of other plan fiduciaries and has a corresponding duty to monitor them.

13.     Defendant Cally Morse resides in Marshall, Michigan. She is Aaron Morse's mother. At all times relevant, Dark Horse and Aaron Morse have held her out as Dark Horse's "Den Mother," "Co-Owner," and "Main Office." At all times relevant, she has been responsible for, among many other relevant things, making sure that all monies to be gathered from employees, allocated and/or transferred to each of the ERISA plans are actually so gathered from employees, allocated and/or transferred. She directly handles employee contributions. She is a fiduciary and/or a de facto fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because at all times relevant she has exerted management and control

5

over the assets of the applicable employee benefit plans. At all times relevant, she also exerted control over the appointment of other plan fiduciaries, and she has a corresponding duty to monitor them.

14.    Kristine Morse resides in Marshall, Michigan. She is Aaron Morse's wife. At all times relevant, Dark Horse and Aaron Morse have held her out as the Company's "Co-Owner," as well as its "Director of Marketing & Social Media." She is a fiduciary and/or a de facto fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because at all times relevant she has exerted management and control over the employee contributions and assets of the applicable employee benefit plans. At all times relevant, she has also exerted control over the appointment of other plan fiduciaries, and she has a corresponding duty to monitor them.

15.    Dark Horse is a fiduciary and/or a de facto fiduciary within the meaning of ERISA § 3(21)A), 29 U.S.C. § 1002(21)(A) because, among other things, it appoints or appointed the fiduciaries of the Health Plan. It has a corresponding duty to monitor those plan fiduciaries.

16.    Under the circumstances, Defendants are each directly liable as co-fiduciaries for each other's violations of ERISA § 404(a), 29 U.S.C. § 1104(a).

17.    All the events in controversy occurred in this Judicial District.

18.    This Court has federal question jurisdiction in this case under 28 U.S.C.

§ 1331, and it has exclusive jurisdiction over Plaintiffs' ERISA and federal common law claims pursuant to ERISA §§ 502(a)(1)(B), and 502(a)(3), 29 U.S.C §§ 1132(a)(1)(B) and 1132(a)(3).

19.     Venue is proper in this district, under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), under ERISA's national venue provision and/or because the plans are administered in this Judicial District and/or because a substantial part of the events or omissions giving rise to these claims occurred and continue to occur in this judicial district.

20.     These plans do not require exhaustion of administrative remedies, and/or any effort to exhaust would be futile in light of the procedural and substantive defects in the plan administrators' and/or fiduciaries' responses to Plaintiffs' efforts to seek ERISA benefits.

21.     Furthermore, to the extent that exhaustion might otherwise be required it must be excused because: (1) Plaintiffs did not have access to documents detailing the provisions of the Health Plan, or providing for administrative review of the denial of a claim for benefits; (2) Plaintiffs were not otherwise informed of the existence of the procedures for pursuing administrative claims; (3) Defendants did not provide Plaintiffs or other participants with summaries of the Health Plan's provisions for resolving claims regarding benefits; (4) when Plaintiffs did in fact inquire about their rights to benefits, nothing came of them; (5) with respect to medical coverage,

Defendants misled Plaintiffs by informing them that coverage existed when no coverage was in place; and (6) Defendants did not inform Plaintiffs of any prescribed procedures for pursuing or appealing claims regarding their eligibility for benefits.

## STATEMENT OF FACTS

**A.     Background: An Abuse of Trust**

22.     Dark Horse presents itself like a family business. The Morse family has owned and operated it from the start. It draws many or most of its employees from the neighboring community. Its owners – especially Aaron – would even "party hard" with their employees.

23.     As the Morse family mismanaged Dark Horse's funds, it continued to rely on, intentionally cultivate, and abuse an atmosphere of so-called "family" and "trust" while repeatedly issuing them bad wage checks that bounced.

24.     The Morses have used the Company to live a life that is high-flying compared to their employees and the standards of their local community. While paying themselves relatively modest salaries on paper, they took their real compensation in other ways, both through and from the Company. Ultimately, they left the Company without money to pay its operating costs, and Defendants began misusing employee wages, contributions and promised benefits to pay directly or indirectly for Defendants' own excesses.

25.     Meanwhile, Dark Horse employees – including essential employees –

mostly live paycheck-to-paycheck. Even Dark Horse's key employees generally make a maximum of perhaps a little more than $40,000 per year.

**B.    Plaintiffs' Reliance on Dark Horse's False Promises Leave Them Holding Huge Medical Bills**

26.    Seth Shubert was a key employee at Dark Horse before he left due to fundamental Company mismanagement and betrayal of his benefit and wage rights. TJ Frith still works at Dark Horse as a line employee.

27.    At all times relevant, Shubert managed the Company's core shipping and receiving operation. He was a full-time employee at Dark Horse and eligible for health insurance benefits there. Despite being key to the Company, he made relatively low wages leaving him and his family in a paycheck-to-paycheck position despite their modest standard of living.

28.    At all times relevant, and as of the filing of this Complaint, Frith has worked as a full-time employee at Dark Horse and eligible for health insurance benefits there. He makes substantially less than the key employees and lives paycheck-to-paycheck despite a modest lifestyle.

29.    Along the way, Plaintiffs and many other Dark Horse employees inquired about their medical benefits.

30.    Defendants intentionally misled Plaintiffs, along with other employees of Dark Horse, to believe they were enrolled in the Health Plan, an ERISA medical benefit plan that was fully-insured through BlueCross BlueShield of Michigan

("BlueCross"). Defendants did so not only by deducting from employee wages amounts that purportedly were to be paid to BlueCross, but by actually telling and reassuring employees that they had such medical care when Defendants knew that simply was not true.

31.     Based on Dark Horse's assurances of medical benefit coverage, on or about June 26, 2019, Shubert sought medical care for his two daughters, who were each under six years old at the time. Each daughter's medical care required brief hospital stays, resulting in medical care costs totaling approximately $40,000.

32.     Beginning approximately July 15, 2019, Shubert began receiving invoices related to his daughters' medical care. These invoices included a line item showing that BlueCross was not paying for any portion of the daughters' medical care.

33.     From approximately July 15 to August 15, 2019, Shubert reached out to the Defendants and to BlueCross to inquire why he was being asked to pay the full cost of his daughters' medical care despite Dark Horse both (a) having purportedly enrolled him and his family in the Health Plan and (b) also having deducted from his wages health insurance premiums to secure medical coverage through that Health Plan.

34.     On or about August 2, 2019, an e-mail chain circulated widely among the owners and employees of Dark Horse, including Defendants Aaron Morse,

Kristine Morse, and Cally Morse as well as Plaintiffs Shubert and Frith. In it, Defendants acknowledged that health insurance coverage had lapsed effective June 3, 2019. Defendant Aaron Morse acknowledged in that same e-mail chain that health insurance coverage had lapsed due to Dark Horse not having timely remitted required health insurance premiums to BlueCross.

35.     In the August 2, 2019 e-mail chain, Defendant Aaron Morse told Dark Horse employees that the Company might "have to set up a payment plan ... until [BlueCross] is back online and back billed" or, alternatively, Dark Horse would "get a new carrier." In that event, wrote Defendant Aaron Morse, Dark Horse "possibly can get [the new carrier] to back date the start date ... that is something that can be done and something we obviously will push for IF we have to go with another carrier." (Emphasis in original).

36.     Based in part on the e-mail from Defendant Aaron Morse, Plaintiff Frith continued to believe and receive assurance that any illness or injury he sustained would be covered by the Health Plan.

37.     The e-mail from Defendant Aaron Morse at no point indicated that employees of Dark Horse did not and/or would not have health insurance coverage covering the entire plan period.

38.     The e-mail from Defendant Aaron Morse did not include a notification to Dark Horse employees of any substantive changes to benefits provided under the

Health Plan, and in fact Plaintiff Frith took the text of the e-mail to mean that he would have complete coverage under the Health Plan.

39.     At no point from June 3, 2019 through August 2, 2019, did Dark Horse stop deducting health insurance premiums from employee wages. As of the date of this filing, Defendants apparently have not claimed to have turned over any portion of those employee wages either to the affected employees or to BlueCross.

40.     On or about August 8, 2019, Plaintiff Shubert resigned his position at Dark Horse. His last paycheck covering that date included a deduction for a health insurance premium just as his other paychecks had done all along the way.

41.     Beginning on or about August 10, 2019, Plaintiff Frith learned of various unannounced meetings held in the offices of Dark Horse. The purpose of these meetings was to enroll Dark Horse employees in replacement health insurance. At no point did Plaintiff Frith receive an official announcement from Defendants that such meetings were held, but he instead learned of them through word-of-mouth.

42.     It is not entirely clear whether the Defendants' failure to provide written notification of meetings was due to inexcusable neglect, incompetence, or Defendants' desire to avoid putting anything in writing that might reflect the Company's mismanagement or be fraudulent.

43.     On or about August 15, 2019, Plaintiff Frith attempted to attend one of the health insurance sign-up meetings held at Dark Horse. The meeting was not

tailored in a way that he was able to attend during his normal work shift. By the time he arrived at the meeting, Dark Horse no longer had sufficient paperwork on hand to enroll Plaintiff Frith in replacement health insurance coverage.

44.     From August 15, 2019, through September 14, 2019, Plaintiff Frith learned of additional unannounced meetings held in the offices of Dark Horse. Again, these meetings were not officially announced by Defendants, but instead Plaintiff Frith learned of them through word-of-mouth. Plaintiff Frith was not able to attend these meetings.

45.     On September 14, 2019, Plaintiff Frith was seriously injured in a motorcycle accident. His injuries required an eight-day stay in the intensive care unit and an eight-week break from work during which time he remained an employee of Dark Horse.

46.     On or about November 1, 2019, Plaintiff Frith was contacted by an authorized representative of Dark Horse, Amy Brown. Ms. Brown asked if she could bring him enrollment paperwork for Dark Horse's new health insurance provider, Priority Health. Ms. Brown told Plaintiff Frith that any health insurance coverage he enrolled in through Priority Health would be sufficient to cover treatments related to the injuries he sustained on September 14, 2019.

47.     On or about November 1, 2019, Ms. Brown delivered the Priority Health enrollment paperwork to Plaintiff Frith while Plaintiff Frith was recuperating

at his father's home. Plaintiff Frith completed this enrollment paperwork during the visit, and Ms. Brown returned to the offices of Dark Horse with the paperwork and purportedly transmitted the paperwork to Priority Health.

48.   On November 11, 2019, Plaintiff Frith returned to work at Dark Horse.

49.   Beginning on or about November 18, 2019, Plaintiff Frith noticed that his wages did not include a deduction for Health Plan insurance premium and that he had not received a health insurance card from Priority Health. Plaintiff Frith inquired about this with Dark Horse, which falsely told him that his enrollment paperwork was returned as undeliverable. Plaintiff Frith requested that Dark Horse immediately transmit his enrollment paperwork to Priority Health.

50.   On or about December 18, 2019, Dark Horse began deducting health insurance premiums from Plaintiff Frith's wages and purportedly began remitting these amounts to Priority Health. Plaintiff Firth had yet to receive a health insurance card from Priority Health.

51.   On or about December 20, 2019, Plaintiff Frith called Priority Health to inquire why he had not received his individual subscriber identification number and why he had not received a health insurance card. In that call, Priority Health informed him that Priority Health had not received any enrollment paperwork related to Plaintiff Frith. Plaintiff Frith confronted an employee of Dark Horse about this serious error and received assurances that Dark Horse would "look into it".

14

52.     On or about January 1, 2020, Plaintiff Frith was shown by a co-worker an email from Priority Health confirming that he did not have health insurance coverage, effective retroactively to September 1, 2019.

53.     At no time did any of the Defendants notify Plaintiffs about alternative continuation coverage that they might obtain in the event of that their Dark Horse medical benefits ended.

54.     From approximately December 18, 2019, through approximately January 15, 2020, Dark Horse continued deducting health insurance premiums from employee wages. Upon information and belief, Plaintiff Frith does not believe these premiums were ever remitted to Priority Health.

55.     As a result of Defendants' failure to procure medical coverage, Plaintiff Frith has been billed more than $140,000 in medical fees and costs.

56.     At all times relevant, Defendants were aware that Plaintiffs requested medical benefits to cover the expenses described herein and, more generally, other medical expenses.

57.     Defendants' communications to Plaintiffs informing them about whether and why such benefits did or did not exist or whether or why contributions were or were not made were false.

58.     Throughout the period from June 1, 2019 to December 31, 2019 (as well as before and after then), Dark Horse and Aaron Morse continued to promise

orally and in writing that the Company would provide complete medical coverage for all expenses during that time period. During that period, the Company and Aaron Morse repeatedly and falsely stated orally and in writing that the Company actually forwarded employee contributions to the insurance carrier and/or actually procured medical coverage. At no time did the Company or Aaron Morse indicate that the Company would terminate or deny coverage.

59.   From January 1, 2019 through the date of this filing, Defendants never notified Plaintiffs of any material changes to their benefits under the Health Plan, including any cancellation of coverage. Throughout that time period, Defendants continually promised to Plaintiffs, either in writing or in personal conversations, that Plaintiffs would be covered under the Health Plan, and that such coverage would extend back to at least June 3, 2019. Plaintiffs believed and relied on these promises to their detriment.

## C.   **The Health Plain was an ERISA Employee Benefit Plan**

60.   ERISA § 3(3) defines "employee benefit plan" as "an employee welfare benefit plan or employee pension benefit plan". 29 U.S.C. § 1102(3).

61.   ERISA § 3(1) defines "employee welfare benefit plan" as

any plan … or program which was … established or maintained by an employer … to the extent that such plan … was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of health insurance or otherwise … medical, surgical, or hospital care or benefits, or benefits in the event of sickness …" 29 U.S.C. § 1102(1).

62.     At all relevant times, the Health Plan was intended to provide medical, surgical, or hospital care or benefits through the purchase of health insurance to employees of Dark Horse. Accordingly, the Health Plan was an employee welfare benefit plan within the meaning of ERISA § 3(1) and, further, an employee benefit plan within the meaning of ERISA § 3(3).

63.     As an ERISA-governed employee welfare benefit plan, the Health Plan must comply with all applicable sections of ERISA and the regulations thereunder. Additionally, the Health Plan must comply with Public Health Services Act § 2715, 42 U.S.C. § 300gg-15, which requires ERISA-governed employee welfare benefit plans to provide summaries of benefits coverage (i.e., summary plan descriptions or "SPDs"). ERISA incorporates the SPD requirement at ERISA § 715, 29 U.S.C. § 1185d.

64.     Not only was Dark Horse required to provide Health Plan SPDs to Dark Horse employees from time to time, but also ERISA regulations required Dark Horse to provide any summary of material modifications to the Health Plan no later than 60 days after any such modification. 29 C.F.R. § 2590.715-2715(b). ERISA § 102(a), 29 U.S.C. § 1022(a), provides that a material modification includes any change to the coverage offered under a plan or policy that would be considered important by an average plan participant. 29 C.F.R. § 2520.104b-3(d). This specifically includes "any plan modification or change that eliminates benefits

17

payable under the plan." 29 C.F.R. § 2520.104b-3(d)(3)(ii).

65.     Defendants did not provide Plaintiffs with the required SPDs and never provided a summary of any material modification indicating the Plaintiffs' benefits under the Plan would be terminated.

**D.     Each Defendant was an ERISA Fiduciary with Respect to the Health Plan**

66.     Under ERISA § 3(21), a person is a plan's fiduciary "to the extent he exercises discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets". 29 U.S.C. § 1002(21)(A)(i). Additionally, a person is a plan's fiduciary if the person "has any discretionary authority or discretionary responsibility in the administration of such plan". 29 U.S.C. § 1002(21)(A)(iii).

67.     Defendants Aaron Morse, Cally Morse, and Kristine Morse are fiduciaries and/or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exert control over plan funds and/or manage or administer the plans.

68.     Insofar as Dark Horse is the entity appointing other plan fiduciaries, Dark Horse itself is a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with a duty to monitor other fiduciaries and is subject to the high standards of fiduciary duties imposed on administrators of an ERISA employee benefit plan. 29 U.S.C. § 1104(a)(1).

## COUNT 1
## ERISA – DENIAL OF BENEFITS DUE
## ERISA § 502(a)(1)(B)

69.     Plaintiffs incorporate all the foregoing paragraphs by reference, as if stated in full herein.

70.     ERISA § 502(a)(1)(B) provides a cause of action for the recovery of benefits wrongfully denied under an ERISA plan. ERISA § 502(a)(1)(B) provides: "A civil action may be brought—

> (1) by a participant or beneficiary—... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

71.     ERISA § 3(7) defines a "participant" as "any employee or former employee of an employer … who is or may become eligible to receive a benefit of any type of employee benefit plan which covers employees of such employer …" 29 U.S.C. § 1102(7).

72.     Plaintiffs Schubert and Frith were, at all relevant times, participants in and beneficiaries of the Health Plan. Shubert's daughters were eligible and enrolled beneficiaries.

73.     The Health Plan promised to provide surgical, hospital and related medical coverage extending to each of the bills described above.

74.     ERISA entitles Plaintiffs Schubert and Frith to recover the unpaid benefits due to cover those bills under the Health Plan and satisfy or eliminate any

related interest, fees or costs charged by medical providers.

75.    Dark Horse and the Health Plan did not provide Plaintiffs with any required plan documents, including but not limited to summary plan descriptions, and so did not properly inform Plaintiffs of any right or requirement to submit a claim or appeal.

76.    Dark Horse Dark Horse and the Health Plan offered Plaintiffs no relief or other opportunity for review relating to the denial or refusal to pay their benefits.

77.    Dark Horse's and the Health Plan's communications to Plaintiffs failed to provide: any reference to the specific plan provisions on which a denial of benefits might be based; a description of any additional material or information necessary for the participant or beneficiary to perfect a claim for benefits and an explanation of why such material or information was necessary; or a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under 29 U.S.C. § 502(a), as required by ERISA § 503, 29 U.S.C. § 1133, and related rules and regulations.

78.    As a result of the foregoing, any further steps by Plaintiffs to exhaust their claims would have been futile, and further exhaustion of administrative remedies should be excused. Notably, Plaintiff Shubert unavailingly tried to resolve these benefit disputes with Dark Horse and Aaron Morse short of litigation.

WHEREFORE Plaintiffs respectfully request that the Court Order Defendant

Dark Horse and/or the Dark Horse Health Plan to provide the benefits and coverage due with respect to the medical bills and related costs described herein, including – if necessary – self-insured payment of all their medical bills, fees and costs. Plaintiffs also seek an award under ERISA of attorney fees and costs under 29 U.S.C. § 1132(g) in relation to this dispute.

**COUNT 2**
**ERISA – BREACH OF FIDUCIARY DUTY**
**ERISA §404(a), 502(a)(3), 502(a)(2)**

79.    Plaintiffs incorporate all the foregoing paragraphs by reference, as if stated in full herein.

80.    ERISA § 404(a) requires fiduciaries "to discharge [their] duties with respect to the plan solely in the interest of the participants and beneficiaries" and, further, "for the exclusive purpose of providing benefits to participants and their beneficiaries … and in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1).

81.    An ERISA fiduciary breaches its duty when it fails to act solely in the interest of a plan's participants or beneficiaries and fails to operate the plan for the exclusive benefit of the plan's participants and beneficiaries.

82.    Additionally, a fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.

83.     Once an ERISA beneficiary or participant has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has a fiduciary obligation to convey complete and accurate information material about the beneficiary's circumstance, even if that requires conveying information about which the beneficiary did not specifically inquire.

84.     ERISA fiduciaries have a duty to provide participants complete and accurate information in response to participants questions.

85.     Defendants, as ERISA fiduciaries, had a duty to: (1) administer the Health Plan for the exclusive benefit of participants and beneficiaries; (2) inform a participant or beneficiary about his or her rights under the Health Plan; (3) give complete and accurate information in response to participants' questions; and (4) refrain from misleading communications to plan participants regarding plan administration, eligibility, and/or extent of benefits under a plan.

86.     As ERISA fiduciaries, Defendants were obligated to personally refrain from arbitrary and discriminatory conduct in denying or procuring a denial of benefits to the Plaintiffs.

87.     While acting as fiduciaries, Defendants violated (1) their duty of care by failing to act solely in the interest of the Health Plan's participants and beneficiaries beginning no later than June 3, 2019; (2) their duty of loyalty by lying to and/or misleading the plan's participants and beneficiaries, stealing and/or

commingling the participants contributions and funds; (3) their duty of prudence by failing to pay insurance premiums when due, failing to pay participants' medical bills when due, and failing to prudently manage participants' funds. Defendants' breaches included, but are not limited to, the following:

a. Upon information and belief, Defendants misappropriated and absconded with employee contributions to the Health Plan that were intended to pay health insurance premium, which constitutes a prima facie breach of their fiduciary duties.

b. No later than June 3, 2019, Defendants failed to remit health insurance premium to BlueCross (or any other suitable carrier) and yet continued to deduct health insurance premium from employee wages. Defendants therefore wrongfully held employee wages without timely remitting those wages to BlueCross or to Priority Health.

c. Defendants did not accurately communicate to Plaintiffs whether Plaintiffs were covered under the medical plan.

d. Defendants prioritized their own interests and denied Plaintiffs' their health insurance coverage so that Defendants could instead use the same monies to pay their own expenses or to cover Company operating expenses shortfalls left by the individual Defendants' own misconduct.

e. Defendants did not operate the Health Plan for the exclusive benefit of the

Health Plan's participants and beneficiaries.

f.  Dark Horse failed to discharge its duties in accordance with the Health Plan's governing documents by failing to provide Plaintiffs with medical insurance benefits under the terms of the Health Plan.

g.  Dark Horse sent Plaintiffs emails falsely stating they had medical coverage, that its lapses were the fault of insurers, and that they otherwise would ensure coverage of medical services to Plaintiff.

h.  Dark Horse did not provide Plaintiffs with any required plan documents, including but not limited to summary plan descriptions, and so did not properly inform Plaintiffs of any right or requirement to submit a claim or appeal.

i.  Dark Horse offered Plaintiffs no relief or other opportunity for review relating to the denial or refusal to pay their benefits.

j.  Dark Horse's communications to Plaintiffs failed to provide: any reference to the specific plan provisions on which a denial of benefits might be based; a description of any additional material or information necessary for the participant or beneficiary to perfect a claim for benefits and an explanation of why such material or information was necessary; or a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a

civil action under 29 U.S.C. § 502(a), as required by ERISA § 503, 29 U.S.C. § 1133, and related rules and regulations.

88.     At least between September 2019 and February 2020, Dark Horse and the individual Defendants have taken steps to seek a merger or other strategic transaction with the Michigan-based Roak Brewing Co. involving an acquisition of all, or substantially all, of Dark Horse's business ("Strategic Transaction"). Upon information and belief – and although the deal was private and information has not been widely available – the parties apparently closed that Strategic Transaction on or about yesterday.

89.     While acting as fiduciaries, Defendants also violated their duties of loyalty, care and prudence by specifically and intentionally renegotiating and restructuring the Strategic Transaction from a putative equity-based merger to instead provide for an "asset sale" of substantially all the Company's assets in a fraudulent and/or voidable transfer of assets, rights and interests designed to avoid a liability over these and other major benefit-related obligations, many of which Defendants were specifically made aware in writing on September 11, 2019. By late September, the ownership of Michigan-based Roak Brewing Co. was made aware in writing of the same material benefit disputes.

90.     Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a "participant [or] beneficiary [can seek] (A) to enjoin any act or practice which violates any provision

of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief

(i) to redress such violations or (ii) to enforce any provisions of this title or the terms

of the plan.

91.    ERISA makes fiduciaries personally liable to the plan for their

breaches. Under ERISA § 409, 29 U.S.C.S. § 1109, any fiduciary:

> who breaches any of the responsibilities, obligations, or duties imposed
> [by ERISA] shall be personally liable to make good to such plan any
> losses to the plan resulting from each such breach, and to restore to such
> plan any profits of such fiduciary which have been made through use
> of assets of the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate,
> including removal of such fiduciary.

ERISA § 502(a)(2) permits a participant to bring a civil action "for appropriate relief

under [29 U.S.C. § 1109]." 29 U.S.C. § 1132(a)(2).

WHEREFORE Plaintiffs respectfully request on behalf of themselves – and

to the fullest extent legally permissible – on behalf of the Plan that the Court:

(1) Compel the Defendants to make full restitution to the Plan to self-insure or

otherwise cover all medical expenses, fees, interest and related costs

incurred during the plan period (extending at least until February 18,

2020);

(2) Enter an Order enjoining further culmination or enforcement of the

Strategic Transaction;

(3) enter an Order voiding the fraudulent or otherwise voidable transfers

conducted in accordance with the Strategic Transaction;

(4) Order the Defendants to produce all plan documents and summaries due under ERISA;

(5) Order Defendants to take steps to help Plaintiffs cure any damage done to their credit records as a result of Defendants' failure to pay or procure the promised benefits;

(6) Award all other equitable relief necessary to make Plaintiffs whole;

(7) Award ERISA attorney fees and costs under 29 U.S.C. § 1132(g) in relation to this dispute.

Respectfully submitted,

February 19, 2020

/s/Saura J. Sahu

CLANCY ADVISORS PLC
Saura J. Sahu (P69627)
*Attorneys for Plaintiffs*
230 Nickels Arcade
328 S. State Street
Ann Arbor, MI 48104
(734) 780-7595
sahu@clancyadvisors.com

KRINO LLP
Edward D. Gehres, III
Blake Trueblood
*Of Counsel for Plaintiffs*
1050 30th St, NW
Washington, DC 20007
Edg@krinowlaw.com
Bmt@krinolaw.com